Marc Jay Bern
Napoli, Bern, Ripka, LLP
350 Fifth Avenue, Suite 7413
New York, NY 10118

      and

Jacob Shisha
Tabak, Mellusi & Shisha LLP
29 Broadway, Suite 2311
New York, NY 10006

ATTORNEYS FOR NINA AND LEE RUNSDORF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| In the Matter of the Complaint<br>Of ANDREW HARNETT | Docket No.: 06-cv-0699 (LMM) |
| In the Matter of Peter J.<br>Sharp Boathouse, Inc. | Docket No.: 06-cv-3061 (LMM) |
| In the Matter of New York Rowing<br>Association, Inc. | Docket No.: 06-cv-3062 (LMM) |
| And a fourth related case | |

------------------------------------------------------------X

**RUNSDORF CLAIMANTS' MEMORANDUM IN OPPOSITION TO PETER J. SHARP BOATHOUSE, INC. AND NEW YORK ROWING ASSOCIATION, INC. MOTION FOR PARTIAL SUMMARY JUDGMENT**

Of Counsel:

Marc Jay Bern
Jacob Shisha

**Napoli, Bern, Ripka, LLP**
350 Fifth Avenue, Suite 7413
New York, NY 10118

**Tabak, Mellusi & Shisha LLP**
29 Broadway, Suite 2311
New York, NY 10006

Nina Runsdorf and Lee Runsdorf ( " Runsdorf Claimants") present their Memorandum of Law In Opposition to the partial motion for summary judgment brought by Peter J. Sharp Boathouse, Inc. ("Boathouse") and New York Rowing Association, Inc ("NYRA") moving the Court to find that they cannot be liable for not providing lights for the crew shells.  Since the Boathouse and NYRA filed a combined Rule 56.1 Statement for all 3 motions they are making Runsdorf Claimants filed one combined Response to Rule 56.1 Statement and Counter Statement of Disputed facts.

**Preliminary Statement**

Inland Navigation Rule 25(d)(ii) provides that boats powered by oars can comply with the rule by either exhibiting a red and green bow light and a white all around  light on the stern, commonly referred to as "running lights", or simply have a flashlight onboard which does not have to be kept on.   Plaintiff's maritime expert testified that had the rowers had a flashlight it could not have prevented the accident because by the time the rowers saw or heard the Harnett boat there was insufficient time to even turn the flashlight on.

The Boathouse hired NYRA to operate the boathouse.  As per the "Operating Agreement"  NYRA was to establish a Water Safety Program, safety regulations; and  were to distribute the regulations to the members, post them in the boathouse, ascertain the members were aware of the rules and enforce the rules.   NYRA was also supposed to provide all supplies and equipment necessary to operate the boathouse, which included running lights.

 NYRA establish rules that required that the boats operate not with a flash light, but with running lights. Tom Curry the manager of the NYRA acknowledged that he knew that the 4 rowers involved in the accident where former college rowers that where getting back into the

sport many years later. Mr. Curry was also aware that when the rowers were in college lights were not used. Despite this, he never advised any of the rowers that the practice had changed and running lights were mandated. Although the Boathouse rules required every member be given a copy of the Boathouse rules none of the rowers ever received copies of the rules. The Boathouse rules were also supposed to be posted in the boathouse they never where. NYRA was supposed to make sure that the rules were being followed and enforced, they never did so. The NYRA was also supposed to make sure they had battery operated operating lights available on the day of the accident, they were not. It is these failures that Runsdorf Claimants base their claims against the Boathouse and NYRA, not a failure to provide a flashlight.

**Factual Background**

The Harlem River has been home to several college and club crew teams, including Columbia University, Fordham University and Manhattan College, Edward Joyce Deposition, Exhibit 1, p116 ("Joyce, Exhibit 1"). A competitive crew race is 2 kilometers (2,000 m) there is stretch of the Harlem River that is marked on the seawall and used as the race course by all the crew teams, Vincent Houston Deposition, Exhibit 2 pp 50-51 ("Houston Exhibit 2"). Due to calmer rowing conditions, and busy academic and work schedules of rowers routinely row before sunrise and after sunset. In the 1970's and 1980's no one rowing on the Harlem River or elsewhere used lights Joyce Exhibit 2, p 116, Thomas Curry Deposition, Exhibit 3, p 114 ("Curry Exhibit3"). To this day the crew shells are not equipped with lights Declaration of Vincent Houston paragraph 4, Exhibit 4   Today there are battery operated lights mounted on bow or stern where the racing numbers go and can be mounted on the bow Houston Declaration, Exhibit 4, paragraph 4.

The Boathouse is a barge that was constructed to be a boathouse that was floated into position and permanently secured in the Harlem River with pilings; she arrived in June or July of 2005, Curry pp. 88-89 Exhibit 3.  In 2003 the Boathouse entered into a written management agreement ("Management Agreement") Exhibit 5, hiring the NYRA to operate the boathouse. Tom Curry was the employed by NYRA as the executive director and manager of the Boathouse; it was a full time job and he was responsible for implementing the Management Agreement, Curry pp 8-9 Exhibit 3.

Pursuant to the Management Agreement NYRA was supposed to set up several rowing programs including a Masters program, which was for older rowers. There was no requirement that you have any training or any specific prior rowing experience, nor where you required to take any safety courses to join the Masters program, Curry p 40-41, Exhibit 3.  The 4 rowers in the boat at the time of the accident, Jim Runsdorf, Edward Joyce, Vincent Houston and Jeff Lundwall were in the Masters program. Under the Management Agreement NYRA was supposed to setup a Water Safety Program, Curry p 24-25, Exhibit 3, promulgate rules and regulations for the safe use of the Boathouse, Curry p 31, Exhibit 3, make sure that people using the Boathouse were aware of those rules, Curry p 32, Exhibit 3, and to enforce the rules Curry p 32, Exhibit 3.

NYRA did not establish a Water Safety Program prior to October 24, 2005 for any rowers other than the Learn to Row program, even though the Management Agreement did not limit the Water Safety Program to the Learn to Row program, Curry p 25-26, Exhibit 3.  NYRA did establish rules and regulations which included a mandate that rowers use lights before sunrise and after sunset.

4

Under the Management Agreement NYRA was supposed to make sure that rowers were aware of the rules Curry p 32, Exhibit 3. There is no evidence Jim Runsdorf ever received a copy of the rules; the evidence is clear that none of the other rowers ever received a copy of the rules. Vincent Houston never received a copy of the rules Houston p.32 -33, Exhibit 2, Edward Joyce never received a copy, Joyce p 110-111, 120, Exhibit 1, Jeff Lundwall was also not aware of the rules, Jeff Lundwall Deposition p 42 , Exhibit 6 ("Lundwall Exhibit 6"). Whenever a rower started rowing at the Boathouse they were supposed to fill out an application that states they will be receiving under separate cover a copy of the rules and then sign the waiver, Curry p 49 -53, Exhibit 3. There is no documentation or any evidence that any of the rowers ever received the rules or executed the waivers, Curry p 49-53, Exhibit 3 and Mr. Curry admitted that he has never ascertained whether any of the 4 men in the crew shell ever received the a copy of the rules, Curry  p 57, Exhibit 3. The applications that were supposed to be signed by the rowers and the waivers were requested in discovery but not produced by NYRA or the Boathouse[1].

Mr. Curry testified that prior to the accident copies of the rules were posted in the boathouse Curry p 52, Exhibit 3. Mr. Joyce testified he never saw them posted in the boathouse, Joyce p 110, 120, Exhibit 1; Mr. Houston did not see them either Houston p 32, Exhibit 2.  On the date of the accident Andrew Harnett was in the boathouse for about 6 to 7 hours following the accident and walked throughout the boathouse and did not see any rules posted, see Harnett Answers to Runsdorf Claimant's Supplemental Interrogatories, Exhibit 7.

---

[1] Mr. Curry testified that in December of 2005 or January of 2007, the fire sprinklers in the boathouse failed and they sustained water damage and some documents got destroyed, and they had water damage again in 2007 or 2008 destroying more documents, Curry p 81-83, Exhibit 3. In light of the fact that the 3 surviving rowers testified they never received the documents or signed waivers, and the fact that Mr. Curry has no recollection of ever seeing those records, it would be pure speculation that those records ever existed and were subsequently destroyed by water damage. Especially in light of the fact that the Management Agreement required that accidents be promptly investigated and that Vince Paparo an attorney who was the Chairman of the NYRA investigated the accident, Curry p 84-86, Exhibit 3.

Mr. Curry testified that he would meet anyone that wanted to join the Masters program but he would not ask them if they were aware of the applicable safety rules Curry p 42, Exhibit 3.  Mr. Curry was aware that it is common that many of the masters rowers had rowed during high school or college and then pick the sport back up in their 40's Curry p 11, Exhibit 3 and Exhibit 8, email from Jim Runsdorf to Tom Curry indicating rowers are in their 40's.   Mr. Curry was aware that back when the 4 rowers were in college lights were not used Curry p 114, Exhibit 3. Edward Joyce testified that he rowed for Columbia for 4 years and that Columbia, Manhattan College and Fordham regularly rowed on the Harlem River before sunrise and after sunset and they <u>never</u> used lights Joyce p 115-117, Exhibit 1.  Mr. Lundwall testified that he never rowed with lights Lundwall, 225 – 226, Exhibit 6. Mr. Curry was aware that the boat Mr. Runsdorf would row in, a coxless 4, would go out prior to sunset Curry p 65 – 66, Exhibit 3.

More often than not there were no lights available and crew shell would row without lights Houston p 59-61, Exhibit 2. It was Mr. Curry's responsibility to make sure the rules were enforced Curry p 61, Exhibit 3.

Mr. Curry testified that according to the Management Agreement NYRA was suppose to provide inventories and supplies to operate the boats and that would include supplying lights Curry p 67-69, Exhibit 3.  These lights were running lights that clipped onto the crew shell stern and bow Curry p 69, Exhibit 3, see also Exhibit 9 NYRA order for LED port and starboard lights (bow), single light stern.

On the morning of October 24, 2005 Vincent Houston looked for lights in the Boathouse and could not find any Houston pp 65-66, Exhibit 2.  He did not mention to any of the 3 other

6

rowers that he could not find a light prior to their going out on the water that morning nor did he tell Jim Runsdorf  Houston p 68, Exhibit 2,  Houston Declaration paragraph 4, Exhibit 4.

## Argument

The Boathouse and NYRA seek partial summary judgment arguing that since Runsdorf's maritime expert, Captain Ahlstrom, opined that the crew shell's failure to comply with  33 U.S.C. § 2025(d)  "Inland Rule 25", lights for sailing vessels and vessels under oars, could not have been a cause of the accident,  the Boathouse and NYRA cannot be held liable for failure to provide lights.  Inland Rule 25(d) states that a vessel under oars can comply with the rule in one of two ways

> (d) Sailing vessels of less than 7 meters in length; vessels under oars
> (i) A sailing vessel of less than 7 meters in length shall, if practicable, exhibit the lights prescribed in paragraph (a) or (b) of this Rule, but if she does not, she shall have ready at hand an electric torch or lighted lantern showing a white light which shall be exhibited in sufficient time to prevent collision.
> (ii) **A vessel under oars may exhibit the lights prescribed in this Rule for sailing vessels[2], but if she does not, she shall have ready at hand an electric torch or lighted lantern showing a white light which shall be exhibited in sufficient time to prevent collision.**

A boat under oars can comply with the light requirements by simply having a flashlight available, which does not have to be turned on at all times.  Captain Ahlstrom opined that even if

---

[2] The for sailing vessel Inland Rule 25(d)(i) above states where possible it should exhibit lights for vessels under Rule 25(a) or (b) which is a red and green bow light and a white stern light.

the crew shell had a complied with Rule 25 (d)(ii) (flashlight) it could not have prevented the collision because the Harnett vessel was not visible or audible until 2-3 seconds before collision, which did not give enough for the men in the crew shell to turn on the light as to prevent collision see Captain Ahlstrom Report p 7-8, Exhibit H of Lawrence Brennan Affidavit. Runsdorf Claimants do not maintain that the Boathouse and NYRA were negligent for failing to provide a flashlight; they maintain that the Boathouse and NYRA were negligent for not supplying the red and green running lights, not advising the rowers that running lights must be used, not providing or posting the rules nor enforcing the rules.

The Boathouse contracted with NYRA to operate the Boathouse.  Under the Management Agreement Tom Curry was to promulgate safety rules, disseminate them to the rowers and enforce the rules.  The Masters program consisted of gentlemen in their 40's who rowed in college and high school and were getting back into the sport.  When these gentlemen rowed in school lights were not used and Tom Curry was aware of this.  Under the Management Agreement he was supposed to promulgate the rules, which included rules requiring lights[3], make sure the rules were provided to the people using the boathouse, they understood than and to enforce the rules.   This was clearly not done.

Failure to follow internal safety guidelines and practices is evidence of negligence see <u>Robinson v Missouri Pacific Railroad Company</u> 16 F.3rd 1083 (10th Cir. 1994) and <u>In Re City of New York, M/V Andrew J. Barberi</u> 475 F.Supp. 2d 235 (E.D.N.Y. 2007).   The Boathouse and NYRA failure to comply with its own internal regulations and procedures to provide running lights, require their use, advising the boathouse users of the mandate of using lights and failing to

---

[3] It is clear that when the rules referred to lights they refer to the running lights, not flashlights.  As shown in Exhibit 9 the lights that were purchased by the boathouse were running lights not flashlights

enforce use of the lights are all basis of negligence; which are in no way inconsistent with Captain Ahlstrom's report.

Runsdorf Claimant's rowing expert, Harriet M. Metcalf, indicated in her report that both the Boathouse and NYRA failed to exercise the proper standard of care for an operator of a boathouse, see page 1, 2 of Exhibit I to Affidavit of Lawrence Brennan.  She opined that if a person had previously rowed the boathouse cannot assume that they are familiar with the requirement of using lights, because lights were not used when many of the rowers had previously rowed and one cannot assume that even younger rowers who had used lights in college would remember lights were required, Exhibit I Lawrence Brennan Affidavit page 2.

Ms. Metcalf stated that a boathouse must:

1. Have rules and regulations in place.
2. Make sure rules and regulations are conveyed to each and every member.
3. Make sure that each rower not only receives the rules and regulations, but understands them and can demonstrate his or her proficiency handling boats.
4. Actively enforce the boathouse rules.
5. Update and change the rules depending on changes in river patterns and conditions.
6. Maintain the rowing equipment and provide required safety equipment including working lights that are readily available   Exhibit I page 3.

Ms. Metcalf stated that not only did the Boathouse fail to comply with these items, it also failed to comply with its own internal operating procedures, by not conveying the regulations to the

9

rower, not making sure they received and understood the rules, not enforcing the boathouse rules, and not providing lights[4].

In addition she found that the total number of lights initially ordered by the NYRA, a year prior, were insufficient for the number of boats in the boathouse for that period of time Exhibit I p.5. These are all basis for finding liability against the Boathouse and NYRA related to the failure to have a light.

The Court is the trier of fact in this case, and can find that movants' failure to provide and require use of running lights, not just merely complying with the minimum requirement of Inland Rule 25(d)(ii) of having a flashlight was negligence and it contributed to the accident. Since Reliable Transfer Co. 421 U.S. 397 (1975) and its prodigy comparative fault applies in maritime torts. The Court can find that the Harnett vessel was negligent, based on the various allegations of failure to comply with the Inland Rules of the Road, and that the rowers were partially negligent for not having running lights and that the Boathouse and NYRA were negligent for not providing lights, not advising the rowers of the requirement of using a lights nor enforcing their use and allocate the fault among all or some of the parties.

Even, if for arguments sake, we were to assume that Runsdorf Claimants alleged that the basis of liability against the Boathouse and NYRA was the failure to provide a flashlight; those claims are not barred simply because their maritime expert opined that the lack of a flashlight could not have caused the accident. The Court can choose to disagree with the expert and find that the lack of a flashlight did play a part in the collision and then allocate a percentage of the

---

[4] These were the failings relative to the issues for the motion before the Court.

fault to the Boathouse and NYRA for failure to provide the flashlight, failure to advise of the requirement of having a flashlight and failure to enforce use of the flashlight.

### Conclusion

For the reasons stated above the Boathouse and NYRA's motion for partial summary judgment should be denied.

Dated: October 19, 2011

                              Respectfully submitted,

                              *Jacob Shisha*

By: _____
     Marc Jay Bern (MB 6608 )
     Jacob Shisha (JS 5452)

Napoli, Bern, Ripka, LLP
350 Fifth Avenue, Suite 7413
New York, NY 10118
Phone (212) 267-3700

TABAK, MELLUSI & SHISHA
29 Broadway
New York, New York 10006
Phone (212) 962-1590
Fax    (212) 385-0920

12