MARC JAY BERN
Napoli, Bern, Ripka, LLP
350 Fifth Avenue, Suite 7413
New York, NY 10118

JACOB SHISHA
Tabak, Mellusi & Shisha LLP
29 Broadway, Suite 2311
New York, NY 10006

ATTORNEYS FOR NINA AND LEE RUNSDORF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In the Matter of the Complaint
Of ANDREW HARNETT                                   Docket No.: 06-cv-0699 (LMM)
In the Matter of Peter J.
Sharp Boathouse, Inc.                               Docket No.: 06-cv-3061 (LMM)

In the Matter of New York Rowing
Association, Inc.                                   Docket No.: 06-cv-3062 (LMM)

And a fourth related case


-----------------------------------------------------------X

## RUNSDORF CLAIMANTS' MEMORANDUM IN OPPOSITION TO NEW YORK ROWING ASSOCIATION, INC. AND PETER J. SHARP BOATHOUSE MOTION FOR PARTIAL SUMMARY JUDGMENT <u>ON DAMAGES</u>

Of Counsel:
Marc Jay Bern
Jacob Shisha

                                 Napoli Bern Ripka Shkolnik, LLP
                                 350 5th Avenue, Suite 7413
                                 NY, NY 10118

                                 Tabak Mellusi & Shisha LLP'
                                 29 Broadway, Suite 2311
                                 NY,NY 10006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iii

PRELIMINARY STATEMENT..........................................................................1

ARGUMENT.........................................................................................................2

POINT I – STANDARD FOR SUMMARY JUDGMENT...................................2

POINT II – RUNSDORF'S LOST FUTURE EARNINGS AS PREVIOUSLY CALCULATED DOES NOT REPRESENT THE LOST FUTURE EARNINGS THAT THE ESTATE WOULD HAVE RECEIVED AFTER RUNSDORF'S DEATH IF IT WERE NOT FOR HIS DEATH BUT WERE CALCULATED BASED ON HIS HISTORICAL EARNINGS FROM HIS PROFESSIONAL REAL ESTATE ACTIVITIES.......................................................................3

POINT III – THE CASH DISTRIBUTIONS FROM REAL ESTATE PARTNERSHIPS IN WHICH RUNSDORF HAD AN OWNERSHIP INTEREST BY VIRTUE OF HIS INVOLVEMENT WITH THE PROJECT(S) MUST BE CONSIDERED HIS INCOME ACCRUED FROM HIS PERSONAL SERVICES FOR PURPOSES OF MEASURING HIS EARNING CAPACITY...............................................................................6

POINT IV – THE CASH DISTRIBUTIONS MUST BE PART OF RUNSDORF'S INCOME FOR HIS PERSONAL SERVICES FOR THE PURPOSE OF MEASURING HIS EARNING CAPACITY BECAUSE THEY PREDOMINANTLY REPRESENTED REWARDS FROM PROVIDING HIS PERSONAL SERVICES..................................................10

POINT V - FOR PURPOSES OF MEASURING RUNSDORF'S EARNING CAPACITY, THE CASH DISTRIBUTIONS RUNSDORF RECEIVED PRIOR TO HIS DEATH ARE NOT SPECULATIVE ...............................................................................................13

CONCLUSION....................................................................................................14

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) .................................................................................................. 2

*Behrens v. Metropolitan Opera Assn, Inc.,*
794 N.Y.S. 2d 301(2005) ......................................................................................... 7

*Boyce v. New York City RY Co.,*
110 N.Y.S. 393 (1908) .......................................................................................... 6, 7

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................................. 2

*Chambers v. TRM Copy Centers Corp.,*
43 F. 3d 29, 37 (2d Cir. 1994) .................................................................................. 3

*Cifarelli v. Village of Babylon,*
93 F.3d 47, 51 (2d Cir. 1996) ................................................................................... 3

*City of Las Cruces v. El Paso Electric Corp.,*
904 F.Supp 1238 (D. N.M. 1995) ............................................................................. 3

*D'Amico v. City of New York,*
132 F.3d 145 (2d Cir. 1998) ..................................................................................... 2

*Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,*
902 F.2d 174 (2d Cir. 1990) ..................................................................................... 2

*Distasio v. Perkin Elmer Corp.,*
157 F.3d 55, 61 (2d Cir. 1998) ................................................................................. 3

*Ehrgott v. The Mayor, Aldermen and Commonalty of the City of NY,*
96 N.Y. 264 (1884) ................................................................................................... 4

*Gallo v. Prudential Resiential Services Ltd. Partnership,*
22 F.3d 1219 (2d Cir. 1994) .................................................................................. 2, 3

*Gombert v. New York C. H. R. R. Co.,*
195 N.Y. 273 (1909) .............................................................................................. 5, 6

*Hill v. Linahan,*
697 F.2d 1032 (11th Cir. 1983) ................................................................................ 2

*Knight v. U.S. Fire Insurance Co.*,
804 F.2d 9 (2d Cir. 1986), 480 U.S. 932 (1987) .................................................................... 2, 3

*Konstantatos v. County of Suffolk*,
174 A.D.2d 653, 571 N.Y.S.2d 514 (2d Dep't 1991) ................................................................ 14

*Kronold v. City of New York*,
78 N.E. 572 (1906) ................................................................................................................. 5

*L.B. Foster Co. v. American Piles, Inc.*,
138 F.3d 81 (2d Cir. 1998) ...................................................................................................... 2

*Machline v. National Helicopter Corp. of American*,
1997 U.S. Dist. LEXIS 20547 (S.D.N.Y. 1997) .................................................................. 9, 10

*Montana v. First Fed. Sav. & Loan Assn.*,
869 F.2d 100 (2d Cir. 1989) .................................................................................................... 2

*Schwepp v. Town of Avon*,
118 F.3d 106, 110 (2d Cir. 1997) ............................................................................................. 3

*Silver v. City Univ. of New York*,
947 F.2d 1021 (2d Cir. 1991) .................................................................................................. 2

*Steitz v. Gifford*,
280 N.Y. 15 (1939) .................................................................................................................. 9

*Woodring v. The Board of Education of Manhasset Union Free School District*,
435 N.Y.S.2d 52 (1981) ................................................................................................... 13, 14

*Zenith Radio Corp. v. Hazeltine Research*,
401 U.S. 321 (1971) ......................................................................................................... 13, 14

## **PATTERN JURY INSTRUCTION**

PJI 2:295 ..................................................................................................................................... 5

**PRELIMINARY STATEMENT**

This claim arose on the morning of October 24, 2005, in the waters of the Harlem River, in the County of Bronx, New York, when the vessel known as READY JET GO owned and operated by Andrew Harnett collided with a rowing shell in which Mr. Jim Runsdorf was an occupant. As a result of this collision, Mr. Runsdorf was killed. He was survived by his wife, Nina Runsdorf, and their two children, Alexa J. Runsdorf and Katherine Teddy Runsdorf.

Mr. Runsdorf was an experienced real estate professional and investor intimately involved with high-end real estate transactions. Mr. Runsdorf was heading into his most productive years of earnings, and would have been able to capitalize on his in-depth knowledge of the real estate market and investing, along with his real estate opportunities, funding resources and persons influential and knowledgeable in the field of commercial real estate.

He got compensated for the services he performed in the form of cash fees generated from the transaction or finder fees and a share of a given project's future income and cash distributions from investment interests received by them in the project. His services included his performance in identification of the real estate site, purchase of the property, day-to-day development of the building, negotiations of the tenant lease, finding additional investors for the project, and maintaining relationships among the stakeholders.

On March 18, 2011, the Runsdorf Claimants submitted the Report of expert witness Stephen Shulman, which provided his estimate the economic pecuniary losses that Nina Runsdorf and her minor children are expected to experience as a result of the wrongful death of Mr. James Runsdorf. This estimate was approximately $20 Million and did not consider pain,

suffering, grief, sorrow, mental anguish, loss of consortium and loss of guidance to his children.

## ARGUMENT

**POINT I: STANDARD FOR SUMMARY JUDGMENT**

Summary judgment should be granted only if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." _D'Amico v. City of New York_, 132 F.3d 145, 149 (2d Cir. 1998), cert. den. 118 S.Ct. 2075 (1998); _Gallo v. Prudential Residential Services Ltd. Partnership_, 22 F.3d 1219 (2d Cir. 1994); _Anderson v. Liberty Lobby_, 477 U.S. 242, 250 (1986). See also _Silver v. City Univ. of New York_, 947 F.2d 1021, 1022 (2d Cir. 1991); _Montana v. First Fed. Sav. & Loan Assn_,. 869 F.2d 100, 103 (2d Cir. 1989); _Knight v. U.S. Fire Insurance Co._, 804 F.2d 9, 11 (2d Cir. 1986), cert. den. 480 U.S. 932 (1987). It should only be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." _Celotex Corp. v. Catrett_, 477 U.S. 317, 322 (1986). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant... and draw all reasonable inferences in its favor." _L.B. Foster Co. v. American Piles, Inc._, 138 F.3d 81 (2d Cir. 1998); _Delaware & Hudson Railway Co. v. Consolidated Rail Corp._, 902 F.2d 174, 177 (2d Cir. 1990). In addition, when a summary judgment is made, all reasonable doubts must be resolved in favor of the party opposing the motion. _Hill v. Linahan_, 697 F.2d 1032 (11th Cir. 1983), reh. den. 701 F.2d 947, and all facts alleged by the non-movant must be taken as true. _Distasio v. Perkin Elmer Corp._, 157 F.3d 55, 61 (2d Cir. 1998). See also _City of Las Cruces v. El Paso Electric Corp._, 904 F.Supp 1238 (D. N.M. 1995). All facts must be construed in favor of the non-movant. All

2

ambiguities and reasonable inferences must be received against the moving party. *Gallo*, supra at p. 1223; *Knight* supra at p. 11. See also *Schwepp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) and *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). If as to the issue on which summary judgment is sought, there is any evidence in the records from any source from which a reasonable inference could be drawn in favor of the non-moving party summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

The Runsdorf Claimants have demonstrated adequate proof to support our damages claim of $20,444,229, in admissible, non-speculative form. Thus, partial summary judgment on economic damages is not warranted in this matter.

**POINT II: RUNSDORF'S LOST FUTURE EARNINGS AS PREVIOUSLY CALCULATED DOES NOT REPRESENT THE LOST FUTURE EARNINGS THAT THE ESTATE WOULD HAVE RECEIVED AFTER RUNSDORF'S DEATH IF IT WERE NOT FOR HIS DEATH *BUT WERE CALCULATED BASED ON HIS HISTORICAL EARNINGS FROM HIS PROFESSIONAL REAL ESTATE ACTIVITIES***

Petitioners would like this Court to believe that Shulman's March 18, 2011 damage calculation is awarding the plaintiffs for funds that they would be receiving after Mr. Runsdorf's death even though Mr. Runsdorf died; occasionally referred to as "double dipping". The Partial Summary Judgment's preliminary statement in the second paragraph states:

> The beneficiaries of the estate retained the ability to profit from these investments even after Jim Runsdorf died. Utlimately, Petitioners New York Rowing Association, Inc. ("NYRA" or "the Rowing Association") and Peter J. Sharp Boathouse, Inc. ("PJSB" or "Boathouse") should not be charged with having to reimburse the Runsdorf claimants for the income that was not in fact lost.

Petitioners then proceed to attempt to convince the court that Shulman's calculation of lost future earnings includes the earnings from real estate investments Mr. Runsdorf received pursuant to his professional real estate activities that were passed on to his estate which

3

continues to receive benefits from these investments. Shulman's report makes it clear that Mr. Runsdorf's lost future earnings were calculated *based on his historical earnings from his active and individual professional real estate activities that he performed* to support his families' needs. See <u>Exhibit 1</u> at paragraphs 20, 22, and 30.  The report makes it clear that Shulman calculated Runsdorf's historical compensation he received, *as a representation of what he would be able to earn from new business he generates as an individual real estate professional*; and *not* to compensate him for revenue streams of existing real estate interests. See <u>Exhibit 1</u> at paragraph 19, 27.

    Courts have used historical earnings in order to estimate pecuniary losses. In <u>Ehrgott v. Mayor of City of NY</u>, 96 N.Y. 264 (1884), the plaintiff was salesman whose income was based upon receiving a certain percentage of the selling price of every copy of encyclopedias sold. The Court held that the plaintiff's income was not from capital invested, but solely from his personal skill and services…and *his earnings for the six or seven years showed what his services were worth to himself and what he was capable of earnings* and thus gave the jury a basis from which to estimate his pecuniary loss. <u>Id.</u> at 276. (emphasis added)  This supports our case because it demonstrates that lost future earnings can be calculated by historical earnings based upon one's personal skills and services, and not from capital invested.

    Moreover, Mr. Runsdorf operated similar to individuals who are self-employed or are partners in active businesses. Mr. Runsdorf was compensated for his individual efforts and was not compensated if his efforts did not generate business for someone else. Mr. Runsdorf supplied services to others, or in conjunction with other real estate professionals, for which he was compensated. Whether it was locating a property for development, finding investors for a project, negotiating the acquisition of a property, obtaining funding for a project, or

maintaining the relationships in a successful deal, Mr. Runsdorf only got compensated if he was successful. This was just like any other self employed individual successfully offering their services or products. *See Exhibit 2* at paragraph 17.

In *Kronold v. City of New York*, 78 N.E. 572 (1906), the plaintiff was engaged in selling Swiss embroideries. He maintained an office, but its equipment and the expense of keeping it were so insignificant as compared with the amount which he earned as the result of personal canvassing and solicitation that it was held to have been error to have excluded proof of his earnings previous to the personal injury upon which he based his action. The court likened this Plaintiff's occupation to that of a lawyer, physician or dentist, and held that his earnings *were the result of his professional skill without capital invested.* Id. at 574. (emphasis added) Their incomes, which, to some extent, at least, are the product of such investments and expenditures, *are classified as personal earnings, the loss of which much be considered as an element of damages in actions for personal injuries.* Id. (emphasis added)

In addition, in *Gombert v. New York C. H. R. R. Co.*, 195 N.Y. 273 (1909), the court stated when a claim for damages arising out of personal injuries is based upon the destruction or impairment of one's ability to perform labor or render service which is essentially and fundamentally personal in character, evidence may be given as to the nature and extent of the loss. Id. at 279. This rule has been applied to lawyers, physicians, dentists, teachers, midwives, pilots, book agent and other professional or semi-professional occupations in which the element of personal earnings has been held to predominate over a small and purely incidental investment of capital. Id. at 279-280 and *PJI 2:295*.

5

Like the <u>Kronold</u> Plaintiff, Runsdorf relied on his professional skill to canvass and solicit business deals. Runsdorf was an accredited[1] real estate investor, a professional occupation, and his personal skill was a predominating factor over an incidental investment of capital (and regardless of the amount of his investment). Therefore, the lost future earnings are indeed recoverable by the Runsdorf Claimants.

**POINT III: THE CASH DISTRIBUTIONS FROM REAL ESTATE PARTNERSHIPS IN WHICH RUNSDORF HAD AN OWNERSHIP INTEREST BY VIRTUE OF HIS INVOLVEMENT WITH THE PROJECT(S) MUST BE CONSIDERED HIS *INCOME ACCRUED FROM HIS PERSONAL SERVICES FOR PURPOSES OF MEASURING HIS EARNING CAPACITY***

In <u>Boyce v. New York City RY Co.,</u> 110 N.Y.S. 393 (1908), the plaintiff was struck by an electric car and and passed away within an hour of the impact. The appellant in that case, made a similar argument as Petitioners, and argued that part of the earnings from the promotion business was derived from the investment of capital, and that hence the proof of earnings from that source should have been excluded. The Court opined "whatever the deceased had in the enterprises which he promoted *was allowed for him for his services*, and did not represent money actually invested." <u>Id.</u> at 396. (emphasis added) "The value of a life cannot be determined with the mathematical precision with which a man's earnings can be ascertained and any fact shedding light on the question is relevant…every fact bearing upon the capacity of the deceased, whatever his occupation, is admissible and cannot be excluded *mainly because the particular ability was to accumulate money by the use of money.* <u>Id.</u> at 397. (emphasis added) Therefore, this Court should consider all of Runsdorf's cash distributions and carried interests in ascertaining the full value of Runsdorf's earning capacity.

Furthermore, the cash distributions Runsdorf received *were compensation* for his

---

[1] See Exhibit 1

6

personal services. See *Exhibit 2* at paragraph 10. The dealmakers of the projects in which Runsdorf was involved, decided to pay Runsdorf his fees, as a result of Runsdorf's personal services, in the form of the cash distributions. Petitioners claim that the Shulman Report combines distributions from investments (which would have passed to the estate) with the fees earned from real estate transactions in our claim for lost earnings and our claim for lost inheritance; however, that is not what the Shulman report set forth. The distributions based on ownership interest was given *to him as a result of his personal services,* and is therefore recoverable. Lost profits from a personal business are recoverable only if, and to the extent that, the profits are dependent on the personal skill, talents, or ability of the plaintiff, as distinguished from profits that are the result of capital investment or the work of others. *PJI 2:295*

In *Behrens v. Metropolitan Opera Association, Inc.*, 794 N.Y.S. 2d 301(2005), Plaintiff was an opera singer and sued the opera house for injuries sustained during a performance, as well as lost earnings. This court held where the record indicates that virtually all of the income and earnings of the corporation were exclusively the product of fees and royalties earned by the plaintiff in her professional career as an opera singer, the lost profits are relevant and admissible to assist the jury in determining plaintiff's lost earnings. Id. at 304. Similar to the Behrens plaintiff, a significant portion of Runsdorf's income were the products of fees and distribution earned by him for *his professional performance and personal services.*

The real estate industry compensates real estate professionals like Mr. Runsdorf in numerous ways for their services provided, such as receiving carried interest in real estate investment partnerships resulting from his involvement in the formation of the real estate deals; cash distributions from investment partnerships in which he had an ownership interest by virtue

7

of his involvement with the project; and the ability to co-invest in real estate ventures along with the individuals (primarily other real estate professional) with whom he conducted business. *See Exhibit 1* at paragraph 19.

Mr. Runsdorf provided his services in order to capitalize on the ability to turn those services into earnings for him. *See Exhibit 2* at paragraph 15. Thus, the rewards of the cash distributions that were generated was Mr. Runsdorf's compensation for the services he provided. He would not have been to able to participate in the manner that he did if he was not providing successful services to the real estate deal that is the basis for the partnership.

Cash distributions are a measure of earnings from his services. Individuals like Mr. Runsdorf make decisions that are based on a primary premise that the value of their successful services needs to be compensated and the cash distributions anticipated from the partnership interests obtained would be equal to or greater than the value of the services provided. *See Exhibit 2* at paragraph 16. This is the manner in which part of Mr. Runsdorf's lost future earnings resulting from his wrongful death would be earned which is needed to reimburse the plaintiff's for their loss. Without Mr. Runsdorf available to provide the services that generates the partnership interests, there would be no way of continuing to provide earnings from new ventures for support of his dependents' needs. *See Exhibit 2* at paragraph 20. Therefore, for the purpose of measuring Runsdorf's earning capacity, the cash distributions Mr. Runsdorf received prior to his death are not speculative.

In *Steitz v. Gifford*, 280 N.Y. 15 (1939), Plaintiff was a farmer who was injured as a result of a motor vehicle collision. He was an expert by education, training, and experience in his line of work. *Id.* at 18. The Court held that the fact that his damages "cannot be measured with absolute mathematical certainty does not bar substantial recovery if they may be

8

approximately fixed". Id. at 20. The business of Plaintiff was *specialized and depended upon his personal effort*...and the loss arose from Plaintiff's personal inability to operate his business. Id. at 21-22. (emphasis added) Runsdorf resembles the Steitz Plaintiff because Runsdorf's real estate business was specialized and depended upon his personal efforts; and therefore his total damages should be recovered.

Moreover, all of the cash distributions prior to his death that was used to estimate his lost future earnings were based on *actual* cash distributions that were received by Mr. Runsdorf. Thus, we were not speculating on those distributions. *See Exhibit 2* at paragraph 21. We averaged the distributions over the six year period for which records were available so as not to skew the estimated lost future earnings. Id. In fact three out of the five years had distributions in excess of $1,200,000. Id. The averaging of the historical distributions was a manner of illustrating that not all the deals that he may initially get involved with turn out successful. However over a period of six years Mr. Runsdorf and his family would expect to be able to generate from new ventures an average of $770,000 a year. Id.

Petitioners wrongly state that the *Machline v. National Helicopter Corp. of American*, 1997 U.S. Dist. LEXIS 20547 (S.D.N.Y. 1997) is factually similar to our case, and is, in fact, clearly distinguishable from the instant case. Petitioners use this case to argue that the cash distribution is compensable as any ownership interest in distribution producing investments that pass to the estate, and not thus should not be included in any calculation of earnings. However, in the *Machline* case, Machline, the decedent-Plaintiff, chose to leave his salary reinvested in the company in order to achieve greater returns through his position as a stockholder. Therefore, Machline, as a stockholder, was not only entitled to receive returns, but also able to take back the reinvested salary. In this case, however, Runsdorf did not reinvest his

9

salary in the company. Instead, the dealmakers decided to pay Runsdorf, as a result of his personal services, in the form of cash distributions. Therefore, distinguishable from Machline in *Machline* case, Runsdorf in this case was only able to receive the distributions, and the invested capitals were not in his possession.

For this reason, the cash distributions Runsdorf had received before his death should be distinguished from the return Machline received as a result of reinvesting his salary to his company. It cannot be understated - Runsdorf did not reinvest his salary to the company. The cash distributions Runsdorf received were his compensation for the personal services he provided. Although the rights to receive the cash distributions passed to Runsdorf's estate, these amounts must be added to Runsdorf's earning capacity.

**POINT IV: THE CASH DISTRIBUTIONS MUST BE PART OF RUNSDORF'S INCOME FOR HIS PERSONAL SERVICES FOR THE PURPOSE OF MEASURING HIS EARNING CAPACITY BECAUSE THEY *PREDOMINANTLY REPRESENTED REWARDS FROM PROVIDING HIS PERSONAL SERVICES***

In certain real estate deals where it was necessary for Mr. Runsdorf to make a dollar investment in the real estate partnership vehicle used to operate the project, it was predominately his contribution of services that helped generate the cash distributions. *See Exhibit 2* at paragraph 18. It was in part because of the services he and the other real estate partners participating in the deals provided that was able to generate the historical cash distributions. Id.

At paragraphs 15 – 19 of the Shulman report, testimony is provided as to the contributions that Runsdorf made by individuals he worked with to support the fact that he was instrumental. *See Exhibit 1* at paragraph 15-19. The returns achieved on the projects upon which he received partnership interests demonstrate a return for the services provided or were far in excess of what you would expect for a return on Mr. Runsdorf invested capital. *See*

*Exhibit 2* at paragraph 20. The excess return can be ultimately attributed to the services he provided. For example,

    a.    Mr. Runsdorf's 20 percent interest in CTC Investments Limited has generated over $2,000,000 in the six year period we analyzed. Yet this 20 percent was a carried interest for which he did not have to invest any funds. Thus all of these funds were for the services he provided.

    b.    The Washburn Wire project that started in 1996 yielded almost $1,200,000 of cash distributions to Mr. Runsdorf during the six year period. This was a project that Mr. Runsdorf was involved in identifying the project, instrumental in rezoning and pursuing necessary government approvals and raising funds. He had raised 50% of the required funds though his network of contacts. Mr. Turner, another business associate described in paragraphs 16 and 17 of my report, put up 40% and for providing the services outlined above and for raising the other 50% of the required investment lent Mr. Runsdorf the principal and interest of approximately $1,200,000 without any personal recourse to Mr. Runsdorf for his capital contribution for his 10% interest In other words his personal assets were never at risk. . Thus Mr. Runsdorf never had to reach into his pocket to make the investment nor did he have to incur any liability. In addition to compensating Mr. Turner for the services he provided, Mr. Turner lent him the funds in this manner so that Mr. Runsdorf would not have a preferential position in the capital put up over others. When the project paid off money in the future; it would be deducted from his share to cover his proportional share of the required capital so that

11

       his payoff would not be proportionally greater than the other partners. Thus here too the $1,200,000 net distribution Mr. Runsdorf received was a result the professional services he provided for which he got his portion of the "upside" of the project.

   c.    Blue Canyon 1800LP was another project that Mr. Runsdorf was instrumental in initiating (See paragraph 27 c. of my Report). In this case Mr. Runsdorf had a carried interest along with an interest in which he invested approximately $17,000. It distributed $170,000 in 2005 before Mr. Runsdorf's Death. Another significant return that represented compensation predominately for the services he provided. Id.

This is the manner in which part of Mr. Runsdorf's lost future earnings resulting from his wrongful death would be earned, i.e. from new services that he would have secured which is needed to reimburse the plaintiff's for their loss. Without Mr. Runsdorf available to provide the services that generates the partnership interests, there would be no way of continuing to provide earnings from new ventures for support of his dependents' needs. Id.

In <u>Woodring v. The Board of Education of Manhasset Union Free School District</u>, 435 N.Y.S.2d 52 (1981), the decedent, an employee of J.C. Penny, was participating in a profit incentive plan as an additional way of compensating him for the use of his skills. Id. at 54. The decedent exhibited a "consistent record of high performance, resulting in yearly profit sharing bonuses", which was held to be indicative of what his future earning capacity would have been and thus properly considered by the jury. Id. Resembling the Plaintiff-decedent in *Woodring*, Runsdorf received his cash distribution as a way of compensating him for the use of his skills. Thus, these distributions are admissible evidence of Runsdorf's future earning capacity.

12

**POINT V: FOR PURPOSES OF MEASURING RUNSDORF'S EARNING CAPACITY, THE CASH DISTRIBUTIONS RUNSDORF RECEIVED PRIOR TO HIS DEATH *ARE NOT SPECULATIVE***

All of the cash distributions prior to his death that were used to estimate his lost future earnings *were based on actual cash distributions that were received by Mr. Runsdorf.* See Exhibit 2 at paragraph 21. Thus, Claimants are not speculating on those distributions. The distributions were averaged over the six-year period for which records were available so as not to skew the estimated lost future earnings. Id. The averaging of the historical distributions was a manner of illustrating that not all the deals that he may initially get involved with turn out successful and to include years of recession and growth. From this six year period, it is reasonable to presume that Mr. Runsdorf and his family would expect him to generate from new ventures an average of $770,000 a year. Id.

Mr. Runsdorf's historical experience and current activity of the times indicates that there was reasonable degree of certainty that he would continue to be able to provide for his family in a manner consistent with prior history from new ventures. *See* Exhibit 2 at paragraph 22. He did not need to provide services to many projects to achieve the historical results he experienced.

Furthermore, the Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321 (1971), cited by Petitioners, stated "in antitrust actions as in others, even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." Id., at 339. Distinguishable from the instant case, the Zenith case was an antitrust case that involved damages arising from "the conduct sued on", and not wrongful death damages. Even if this Court would take the Zenith case into account, accrual of Runsdorf's damages are

13

not speculative as all of the cash distributions prior to his death that were used to estimate his lost future earnings *were based on actual cash distributions that were received by Mr. Runsdorf.*

Equally distinguishable is the <u>Konstantatos v. County of Suffolk</u>, 571 N.Y.S.2d 514 (2d Dep't 1991), that the Petitioners cite. This case involved a decedent diner-owner who claimed pecuniary loss to the two corporations, which did business as family diners. The *Konstantatos* Court held that a "corporation is not a beneficiary of the decedent, and thus, is a not a person for whose benefit the wrongful death action is brought". <u>Id</u>., at 2-3 In the instant case, we are *not* claiming any corporation as a beneficiary, and it is clear that this action being brought for the benefit of Nina Runsdorf and her and Jim's two daughters (and not a corporation).

**CONCLUSION**

It is clear that there lies a genuine issue as to material fact with respect to the financial evidence presented by Runsdorf Claimants and what the Petitioners Peter J. Sharp Boathouse and New York Rowing Association consider admissible. The Runsdorf Claimants are able to demonstrate that the evidence in support of the $20million (rounded) damages claim is in fact, admissible, and not speculative.

For the reasons stated above, the Boathouse and NYRA's motion for partial summary judgment should be denied.

Dated: November 4, 2011

                                          Respectfully submitted,

                                          */s/ Marc Jay Bern*

                                          Marc Jay Bern (MB 6608)
                                          Jacob Shisha (JS 5452)

Napoli Bern Ripka Shkolnik, LLP
350 5th Avenue, Suite 7413
NY, NY 10118

Tabak Mellusi & Shisha LLP'
29 Broadway, Suite 2311
NY,NY 10006

15