United States District Court
Southern District of New York

| | |
|---|---|
| In the Matter of the Complaint<br>Of ANDREW HARNETT | Docket No.: 06-cv-0699 (LMM) |
| In the Matter of Peter J Sharp Boathouse | Docket No.: 06-cv-3061 (LMM) |
| In the Matter of New York Rowing<br>Association, Inc. | Docket No.: 06-cv-3062 (LMM) |
| In the Matter of Nina Runsdorf and Lee<br>Runsdorf, ("claimants") | |

## AFFIDAVIT OF STEPHEN W. SHULMAN

State Of New York        )
                         :ss.:
County Of New York       )

Stephen W. Shulman, being duly sworn deposes and says:

1. I am Stephen W. Shulman, CPA/ABV, CVA, CFF of Anchin Block & Anchin LLP ("Anchin").

2. I am a Certified Public Accountant and a partner in Anchin, Block & Anchin LLP, a firm of Accountants and Consultants with approximately 330 partners and employees. I am the Partner-In-Charge of the Litigation, Forensic and Valuation Services Group at Anchin.

3. I am also a Certified Valuation Analyst ("CVA") accredited by the National Association of Certified Valuation Analysts ("NACVA"), as well as Certified in Financial Forensics ("CFF") and Accredited in Business Valuation ("ABV") by the American Institute of Certified Public Accountants ("AICPA"). I also have been accredited by the Forensic Certified Public Accounting Society as a FCPA.

4. During the past nineteen-plus years, I have conducted numerous economic analyses, forensic examinations and investigations in connection with litigation and other dispute resolutions in order to determine, among other things, the amount of economic losses, lost earnings, lost profit, lost

1

value, misappropriated funds and damages arising from a party's or parties' misconduct. Over the years, I have calculated and consulted with various clients over the calculation of economic damages related to personal injury. I have testified as an expert at trials and proceedings before the New York State Supreme Court, Superior Court of New Jersey Chancery Division, the United States District Courts, the American Arbitration Association, and the International Chamber of Commerce. Since 1998, I testified at trial, was deposed, and/or rendered a written expert report in twenty-seven separate litigations and arbitrations.

5.  My curriculum vitae is attached as Appendix A.

6.  I have been retained by Nina Runsdorf and Lee Runsdorf, ("claimants" in this action and Executors of the Estate of Jim Runsdorf, the "decedent"), through Napoli Bern Ripka, LLP, as an expert to provide an economic analysis of the pecuniary losses that Nina Runsdorf, individually, and her minor children, Alexa J. Runsdorf and Katherine Teddy Runsdorf, are expected to experience as a result of the wrongful death of Mr. James Runsdorf.

7.  I have submitted the Expert Report of Stephen Shulman (the "Report") dated March 18, 2011 that provided my estimate of the economic pecuniary losses that Nina Runsdorf, individually, and her minor children, Alexa J. Runsdorf and Katherine Teddy Runsdorf, are expected to experience as a result of the wrongful death of Mr. James Runsdorf.

8.  I reaffirm that my estimate of the economic pecuniary losses that Nina Runsdorf, individually, and her minor children, Alexa J. Runsdorf and Katherine Teddy Runsdorf, are expected to experience as a result of the wrongful death of Mr. James Runsdorf is $20 million (rounded).

9.  Further, I was asked to further clarify certain items raised by opposing counsel's Memorandum of Law in Support of Motion for Partial Summary Judgment on Damages on Behalf of New York Rowing Association, Inc. and Peter J. Sharp Boathouse, Inc. (the "Memorandum for Partial Summary Judgment).

**In Summary**

10. Mr. Runsdorf was a real estate professional who like others in the real estate industry got compensated for the services they perform in the form of 1) cash fees generated from the transaction or finder fees (usually at the time of closing) and 2) a share of a project's future income and cash distributions from investment interests received by them in the project. All of which would have been considered compensation to Mr. Runsdorf. This is not dissimilar to real estate brokers who only receives a brokerage commission (which is a fee) at a set rate except that Mr. Runsdorf received a portion of his compensation for services in the form of an interest in the real estate partnership used as vehicle to own, develop and operate the real estate procured.

11. Moreover, Mr. Runsdorf's portion of his compensation received as an interest in a real estate partnership required no investment, or minimal investment, of his own funds. Consequently, the fees generated and the cash distributions from the projects are purely and predominately compensation for his services.

12. Mr. Runsdorf significantly participated in and was compensated for various capacities he performed including the: 1) identification of the site, 2) purchase of the property, 3) day-to-day development of the building, 4) negotiations of the tenant lease, 5) finding additional investors for the project and 6) maintained relationships with and among the stakeholders

13. We based our estimate of the lost future earnings from services he would have been able to provide on new non existing projects in the future based on the actual cash received by Mr. Runsdorf both in the form of fees and cash distributions for the period from 2000 through 2005 from projects consummated. This period includes periods of recession and periods of growth in the economy. Thus, we were not speculating on his future earnings potential; rather,

we are using his historical track record to determine what he would be expected to achieve in the future through new deals that generate fees and additional cash distributions. We did not include any anticipated proceeds from partnership interests he received for services prior to his death in our estimate of lost future earnings.

**The cash distributions from real estate partnerships in which Mr. Runsdorf had an ownership interest by virtue of his involvement with the project must be considered his income accrued from his personal services for the purpose of measuring Runsdorf's earning capacity.**

14. The real estate industry compensates real estate professionals like Mr. Runsdorf in numerous ways for their services provided. As outlined in paragraph 19 of my Report it includes among other ways:

   a. receiving carried interest in real estate investment partnerships resulting from his involvement in the formation of the real estate deal;

   b. cash distributions from investment partnerships in which he had an ownership interest by virtue of his involvement with the project; and

   c. the ability to co-invest in real estate ventures along with the individuals[1] with whom he conducted business

15. All of these methods result in cash distributions from the partnership interests. In effect, Mr. Runsdorf provides his services in order to capitalize on the ability to turn those services into earnings for himself. Thus, the rewards of the cash distributions that are generated are Mr. Runsdorf's compensation for his services he provides. He would not have been to able to participate in the manner that he did if he was not providing successful services to the real estate deal that is the basis for the partnership.

---

[1] Primarily other real estate professionals.

16.     Cash distributions are a measure of earnings from his services. Individuals like Mr. Runsdorf make decisions that are based on a primary premise that the value of their successful services needs to be compensated and the cash distributions anticipated from the partnership interests obtained would be equal to or greater than the value of the services provided.

**Mr. Runsdorf earned his living very much the same way as a self employed individual business operator**

17.     Mr. Runsdorf operated similar to individuals who are self employed or are partners in active businesses. Mr. Runsdorf was compensated for his individual efforts and was not compensated if his efforts did not generate business for someone else. Mr. Runsdorf supplied services to others, or in conjunction with other real estate professionals, for which he was compensated. Whether it was locating a property for development, finding investors for a project, negotiating the acquisition of a property, obtaining funding for a project, or maintaining the relationships in a successful deal, Mr. Runsdorf only got compensated if he was successful. This was just like any other self employed individual successfully offering their services or products.

**The cash distributions must be part of Runsdorf's income for his personal services for the purpose of measuring his earning capacity because they predominately represented rewards from providing his personal services**

18.     In certain real estate deals where it was necessary for Mr. Runsdorf to make a dollar investment in the real estate partnership vehicle used to operate the project, it was predominately his contribution of services that helped generate the cash distributions. It was in part because of the services he and the other real estate partners participating in the deals provided that was able to generate the historical cash distributions.

5

19.     Paragraphs 15 – 19 of my report provide testimony as to the contributions he made by individuals he worked with to support the fact that he was instrumental.

20.     The returns achieved on the projects upon which he received partnership interests demonstrate a return for the services provided or were far in excess of what you would expect for a return on Mr. Runsdorf's invested capital. The excess return can be ultimately attributed to the services he provided. For example,

    a. Mr. Runsdorf's 20 percent interest in CTC Investments Limited has generated over $2,000,000 in the six year period we analyzed. Yet this 20 percent was a carried interest for which he did not have to invest any funds.[2] Thus all of these funds were for the services he provided.

    b. The Washburn Wire project that started in 1996 yielded almost $1,200,000 of cash distributions to Mr. Runsdorf during the six year period. This was a project that Mr. Runsdorf was involved in identifying the project, instrumental in rezoning and pursuing necessary government approvals and raising funds. He had raised 50% of the required funds though his network of contacts. Mr. Turner, another business associate. described in paragraphs 16 and 17 of my report, put up 40% and for providing the services outlined above and for raising the other 50% of the required investment lent Mr. Runsdorf the principal and interest of approximately $1,200,000 without any personal recourse to Mr. Runsdorf for his capital contribution for his 10% interest In other words his personal assets were never at risk. Thus Mr. Runsdorf never had to reach into his pocket to make the investment nor did he have to incur any liability. In addition to compensating Mr. Turner for the services he

---

[2] Per Mr. Cohen in a telephone interview on October 18, 2011

provided, Mr. Turner lent him the funds in this manner so that Mr. Runsdorf would not have a preferential position in the capital put up over others. When the project paid off money in the future, it would be deducted from his share to cover his proportional share of the required capital so that his payoff would not be proportionally greater than the other partners.[3] Thus here too the $1,200,000 net distribution Mr. Runsdorf received was a result the professional services he provided for which he got his portion of the "upside" of the project.

c. Blue Canyon 1800LP was another project that Mr. Runsdorf was instrumental in initiating (See paragraph 27 c. of my Report). In this case Mr. Runsdorf had a carried interest along with an interest in which he invested approximately $17,000.[4] It distributed $170,000 in 2005 before Mr. Runsdorf's Death. Another significant return that represented compensation predominately for the services he provided.

This is the manner in which part of Mr. Runsdorf's lost future earnings resulting from his wrongful death would be earned from new services that he would have secured which is needed to reimburse the plaintiff's for their loss. Without Mr. Runsdorf available to provide the services that generates the partnership interests there would be no way of continuing to provide earnings from new ventures for support of his dependents' needs.

---

[3] Per telephone interview with Mr. Turner on October 19, 2011.
[4] Per Mr. Cohen in a telephone interview on October 18, 2011

**For the purpose of measuring Runsdorf's earning capacity, the cash distributions Mr. Runsdorf received prior to his death are not speculative**

21. All of the cash distributions prior to his death that was used to estimate his lost future earnings were based on actual cash distributions that were received by Mr. Runsdorf. Thus, we were not speculating on those distributions. We averaged the distributions over the six year period for which records were available so as not to skew the estimated lost future earnings. In fact, three out of the five years had distributions in excess of $1,200,000. The averaging of the historical distributions was a manner of illustrating that not all the deals that he may initially get involved with turn out successful and to include years of recession and growth. From this six year period, it is reasonable to presume that Mr. Runsdorf and his family would expect him to generate from new ventures an average of $770,000 a year.

22. Mr. Runsdorf's historical experience and current activity indicates that there was reasonable degree of certainty that he would continue to be able to provide for his family in a manner consistent with prior history from new ventures. Mr. Runsdorf was involved in very significant projects that generated large compensation to him. He did not need to provide services to many projects to achieve the historical results he experienced. Paragraph 27 (k) outlines current projects he was working on at the time of his death any one of which would generate hundreds of thousands of dollars and in some cases millions in compensation. Exhibit 1 of my report shows the large amounts of money generated for him in the past for specific deals.

23. In addition, I understand that Mr. Cohen and Mr. Turner will testify to the fact they have continued to generate income during recent years that included a recession. In addition I understand that Mr. Turner will testify that while 2008 and 2009 were "quiet years", 2010 and 2011 more than made up for them. These years have represented the "best years" of his career. Thus supporting that on average real estate people expect to maintain their earnings. Since Mr.

Runsdorf was doing business with Mr. Cohen and maintained his relationships with Mr. Turner, both will testify that Mr. Runsdorf would have been able to generate income from new sources with them as well as with others.

**Lost future earnings as calculated in my Report does not represent the lost future earnings that the estate would have received after Mr. Runsdorf's death if it were not for his death**

24.   The opposing counsel's Memorandum for Partial Summary Judgment wants the court to believe that my damage calculation is awarding the plaintiffs for funds that they would be receiving after Mr. Runsdorf's death even though Mr. Runsdorf died. This is sometimes referred to as "double dipping". The Partial Summary Judgment's preliminary statement in the second paragraph states:

> The beneficiaries of the estate retained the ability to profit from these investments even after Jim Runsdorf died. Ultimately, Petitioners New York Rowing Association, Inc. ("NYRA" or "the Rowing Association") and Peter J. Sharp Boathouse, Inc. ("PJSB" or "Boathouse") should not be charged with having to reimburse the Runsdorf claimants for the income that was not in fact lost.

25.   This preliminary statement is further clarified in the Memorandum for Summary Judgment to convince the court that my calculation of lost future earnings includes the earnings from real estate investments Mr. Runsdorf received prior to his death pursuant to his professional real estate activities that were passed on to his estate. And that, the estate would continue to receive the cash distribution from these investments.

26.   As repeated in my Report in paragraphs 20, 22, and 30, it was made clear that we calculated Mr. Runsdorf's lost future earnings based on his historical earnings from his active and individual professional real estate activities that he performed to support his families' needs. We used Mr. Runsdorf's historical compensation he received, as outlined in paragraph 19, 27,

and Exhibits 1 in my Report, as a representation of what he would be able to earn from **new** business he generates as an individual real estate professional. It was not to compensate him for revenue streams of existing real estate interests, as the opposing counsel would suggest. Thus we were not "double dipping".

27. The estate may continue to receive cash distributions from the real estate interests received prior to his death, but they are not included in our estimate of lost future earnings.

**Petitioners' arguments are form over substance; his partnership interests and cash distributions he received were the value of the services he provided**

28. The petitioners are trying to argue that because Mr. Runsdorf's income comes from cash distributions from partnership interests they are not to be considered in calculating the lost future earnings. However, this is the manner that real estate professionals, like Mr. Runsdorf, are typically compensated. There is an advantageous tax benefit to be compensated with an interest in a real estate partnership. As explained in my Report, paragraphs 33- 39, yearly distributions to partners from real estate partnerships are only taxable to the extent of the taxable income earned. In general, real estate partnerships can have distributions in excess of the taxable earnings primarily as a result of non cash expenses like depreciation and amortization of the fixed assets e.g., buildings, capital improvements, amortized debt expenses which would not be taxable.

29. However, the biggest advantage comes from the ability of the partners to refinance the property when the value of the property increases. This means that the partners of the property can borrow money against the increased value of the property, payoff existing debt and distribute to the partners the extra cash generated from the appreciated value, if they choose to do so. In these instances it is not uncommon for partners to have their initial capital returned.

In effect, the partners are receiving the profit and earnings from the property as measured by the appreciated value before the building is actually sold. This refinanced extra cash distributed is not taxable to the partners.

30. Ultimately, this extra cash will be taxed but not until the building is actually sold. When it is sold any gain on the sale of the property will be federally taxed at capital gains rates ranging from 15% to 25% which is much less than highest marginal tax bracket of 35%.

31. Thus, it behooves real estate professionals to utilize partnerships to make their money from the work they perform in a tax advantaged manner. However, since capital accounts are established for partners and cash distributions are made to track their income, it appears they are more of an investor than a real estate professional being compensated for the work they perform and the fruits of their work they generate from the businesses they run.

_____
Stephen W. Shulman, CPA/ABV, CVA, CFF

Sworn to before me this
21st day of October, 2011

_____
Notary

PATRICIA TRACY
Notary Public, State of New York
No. 01TR6197667
Qualified in Queens County
Commission Expires Dec. 1, 2012