UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
IN THE MATTER OF THE COMPLAINT                    **Index No.** 09 cv 699 (LMM)

        of

ANDREW HARNETT as owner of Vessel M/V
READY JET GO for Exoneration from or
Limitation of Liability,

                Petitioner.
--------------------------------------------------------------x

**ANDREW HARNETT'S
REPLY MEMORANDUM OF LAW**

Of Counsel:
James E. Mercante (JM 4231)
Michael E. Stern  (MS 9113)

**RUBIN, FIORELLA & FRIEDMAN LLP**
292 Madison Avenue, 11th Floor
New York, NY 10017
212-953-2381
357-7842

## PRELIMINARY STATEMENT

The decision of Jim Runsdorf and the other three rowers to venture out in the navigable waters of the Harlem River in darkness, in dark clothing, without navigation lights, and without an escort boat was not only in violation of the Navigation Rules, but the epitome of poor judgment.  The choice led to a collision which was the rowers' sole fault.

The Estate of Runsdorf has not submitted any evidence to create a *genuine* factual dispute.  To the contrary, in its Counter Statement of Material Facts, the Estate has now *admitted* the following facts:

* the rowing shell was unlit and the rowers decided to go out nonetheless ;

* it was dark when the rowers launched the shell at about 6 a.m.

* the rowers were not accompanied by an escort boat;

* the rowers were close to the middle of the Harlem River when they turned to travel north;

* since the collision occurred between 6:15 a.m. and 6:22 a.m., it was still night at the time of the collision, with twilight at 6:47 and dawn at 7:17;

* Harnett operated his boat at 16 mph into the Harlem River current of 1.75 to 3 mph, which equates to a boat speed over ground of between only 13 and 14.25 mph.; and

* Harnett transited the Hudson River from Piermont, New York to Spuyten Duvyil, contacted the bridge operator and waited for the bridge to open, transited the bridge into the Harlem River and navigated the upper Harlem River, indicating that Harnett maintained a proper and effective lookout.

The Estate has, for the first time, even conceded that the Court can find the rowers negligent for not having running lights (in its opposition to the Boathouse's motion for summary judgment). Yet, this concession is tempered by a refusal to accept responsibility for Mr. Runsdorf's personal negligence, essentially blaming rower Vincent Houston for allegedly not telling Runsdorf the obvious: *that there was no light on the rowing shell.*[1]

As to facts the Estate refuses to admit, it offers only conjecture and unsupported argument to rebut the evidence submitted by Harnett in his moving papers. For example, the Estate seeks to deny that Mr. Harnett's boat had its running lights on, arguing that Mr. Harnett did not recall turning them on in the morning. However, Mr. Houston and Mr. Brady testified that the READY JET GO had its lights on.

Accordingly, the undisputed facts demonstrate, as stated in the Court's Memorandum and Order that "*a darker sky might suggest that the rowers possessed insufficient lighting and were thus wholly responsible for the casualty*". There is no genuine issue of material fact that the accident occurred solely due to their fatal decision.

---

[1] The allocation of responsibility amongst the rowers *inter se* is immaterial on this motion for summary judgment.

# POINT I

## THE ACCIDENT OCCURRED AT NIGHT

### *The Accident Occurred at Night*

The Estate now admits that the accident occurred before 6:22 a.m., before both civil

twilight (6:47 a.m.) and dawn (7:17 a.m.). *See*, Counter Statement of Material Facts at ¶¶ 14, 15.

It is therefore admitted that accident occurred at *night*.[2]

The Estate has failed to introduce any facts to show that the River was not a *"river of*

*darkness"*, which it must do to defeat the motion for summary judgment. *See*, Deposition of

Harnett at p. 275 (Exhibit 4). Instead, the Estate once again argues that there was *"good*

*visibility"* and *"ambient light from the surrounding facilities"* on shore. *See e.g.*, Memorandum

in Opposition at p. 5.[3] Other than testimony that the rowers could see the MTA facility, lights on

buildings and the roadway and other lit objects ashore, the Estate has failed to introduce any facts

to show that a person on the river could see the unlit rowing shell. And, one question that the

Estate does not even attempt to answer is, if there was so-called ambient light, why did the

rowers not see the READY JET GO traveling with its running lights on and in the same direction

as the rowers for at least five minutes?[4]

---

[2] Remarkably, one paragraph after admitting that the accident occurred before twilight, the Estate claims that the collision occurred during twilight. *See*, Counter Statement of Material Facts at ¶ 16. This is but one example of the misstatements by the Estate that demonstrate a desperate attempt to create a genuine factual issue when none exists.

[3] As discussed in petitioner's moving brief, the concept of "good visibility" refers to the lack of fog, rain or other impediments to visibility; it does not mean that a person can see an unlit object in the dark.

[4] Despite simply denying that the lights on the READY JET GO were illuminated, the Estate has introduced no genuine factual evidence to demonstrate otherwise. Indeed, Vincent Houston admitted that he saw the running lights on when he was on board the READY JET GO and Richard Brady testified that

Importantly, the first responding police officers could not see the unlit rowing shell despite knowing its approximate location. The report produced by the Police Department indicated that the responding officers had to *"proceed slowly because of the pitch-black conditions on the river"* and that the lookout on the police boat "did not see the shell until they 'were on it'". And this was at 6:30 a.m., about ten minutes *after* the accident. *See*, NYPD Complaint Follow-Up bate stamped NYPD000000032 (Exhibit B to Affidavit of Lawrence B. Brennan).

### *It is Undisputed That Harnett Operated at a Prudent Speed*

The Estate admits that Harnett operated his boat at about 16 m.p.h. into a swift current of between 1.75 and 3 m.p.h. *See*, Counter-Statement of Material Facts at ¶¶ 18 - 19.

Once again, the Estate fails to submit factual evidence to demonstrate that a relative speed of between 13 and 14.25 mph was unsafe. As discussed in Petitioner's moving papers, the concept of a *safe speed* is relative to, most importantly, the ability of an operator to maneuver or stop in time to prevent a collision. This critical issue was not addressed in the report of Captain Ahlstrom. The Estate has not offered any evidence to demonstrate that at the speed Harnett was traveling, he would not have been able to avoid a collision.

The Estate now seeks to revisit its own expert report because of the unsubstantiated claim by Captain Ahlstrom that Harnett should have been operating at 4 to 6 mph, despite the fact that

---

the all around white light was on. *See*, Deposition of Houston at p. 128 (Exhibit 7 to the Stern Declaration); Deposition of Brady at p. 131 (Exhibit 5 to the Stern Declaration). The Estate's denial of this undisputed fact rests merely on semantics - that Mr. Harnett did not specifically recall putting his lights on when he left from Piermont, although testifying that it was his custom and practice to put on the lights at night. Indeed, when asked directly whether his all around white light and red and green running lights were on, Harnett testified *"Yes"*. *See*, Deposition of Harnett at p. 190 (Exhibit 13 to Supplemental Declaration of Michael Stern).

Harnett would hardly have been making any headway in the river at this speed in view of the swift current. Amazingly, the Estate now claims (without an affidavit to this effect from Captain Ahlstrom) that Captain Ahlstrom really meant to say that Harnett should have operated his boat at 4 to 6 mph "*taking into account the current*". *See*, Memorandum in Opposition at p. 6. First, this is not what Captain Ahlstrom states in his report and should therefore be rejected by the Court. More importantly, though, is the fact that had Harnett been traveling 4 to 6 mph faster than the current, he would have been traveling at between 5.75 mph and 9 mph. The Estate offers nothing to suggest, let alone prove, that there is any material difference between 9 mph and 13 mph.[5]

It is therefore undisputed that Harnett operated the READY JET GO at a prudent speed.

***Visibility from the Boat is Not an Issue***

The Estate admits that Harnett safely navigated the long distance from his home in Piermont, New York, through the dark Hudson River to the Spuyten Duyvil Bridge, contacted the bridge operator and waited for the bridge to be opened, transited the bridge into the Harlem River and safely navigated the narrow and winding upper Harlem River. *See*, Counter-Statement of Material Facts at ¶¶ 18 - 19. These undisputed facts demonstrate that Harnett exhibited good situational awareness and that his visibility was not impeded by any dirt on the windshield.[6]

---

[5] The Estate further rehashes its baseless and unsupported assertion that Harnett knew that the Peter J Sharp Boathouse was a boathouse and that he knew that there would be rowers in the water. It is undisputed that Harnett did not know that the lit structure was a boathouse. It is further undisputed that Harnett did not know that any rowers, other than the Columbia team, used the River.

[6] The Estate makes other absurd arguments in its Memorandum. For example, it is baseless to claim that Harnett was lucky in not having had an accident that morning before the collision and likening him to a drunk driver. Further, the statement that the Hudson River is not used by rowing shells is flat wrong. Indeed, Mr. Harnett testified that he and his fellow rowers in Piermont row in the Hudson River. Perhaps the Estate means that rowers in the Hudson do not row at night without lights, as these rowers

There is simply no factual support for the argument of counsel that there is a "strong" factual dispute as to visibility. Whether Mr. Houston was or was not able to see through the windshield after the accident simply does not create a fact as to whether Mr. Harnett was able to see through the windshield *before* the accident. The undisputed facts establish that Mr. Harnett had full and unimpeded visibility from his boat.

### Harnett Was on the Proper Side of the River

Harnett was navigating where the Navigation Rules required. It is undisputed that Mr. Harnett was driving on the Manhattan side of the Harlem River. *See*, Deposition of Harnett at p. 122 ("I would have been favoring the Manhattan side of the river") (Exhibit 4). It is also undisputed that the rowers were in the middle of the River were rowing south, and then again after turning to the north. *See*, Deposition of Houston at p. 75 - 77 (confirming that the rowers rowed "pretty much in the middle of the river" and were "still in the center" of the River after turning around to the north) (Exhibit 7).

A critical fact ignored by the Estate that demonstrates conclusively the location of the accident is that police divers from Manhattan's 34th Precinct (and not the 46 Precinct in the Bronx) recovered Mr. Runsdorf's body *"in the middle of the river"*. *See*, NYPD Complaint Follow-Up bate stamped NYPD000000044 (Exhibit B to Affidavit of Lawrence B. Brennan). It is undisputed that his body was recovered where he entered the water, in the middle of the river. *See*, Report of Charles Wetli (Exhibit 14 to Supplemental Stern Decl.)

### The Rowing Shell Was Unlit and Unescorted

The Estate not only admits that the rowing shell was low to the water, unlit and

---

did on October 24, 2005 in the Harlem River?

unescorted, it also now admits that the other rowers in the shell *"decided to go out on the Harlem River in the dark despite that the shell was unlit"*. *See*, Counter-Statement of Material Facts at ¶¶ 3 - 6. Since it is true that operating a vessel in the dark without lights is "*an act of folly so extreme,*" Granholm v. The TFL Express, 576 F. Supp. 435, 447 (S.D.N.Y. 1983), this admission alone should be sufficient to exonerate Mr. Harnett.

Despite admitting that the rowing shell was not equipped with any form of light, the Estate seeks to hold the other rowers responsible, arguing that there is no evidence that Mr. Runsdorf knew that Mr. Houston did not put a light on the shell and that it was unlit.  Not only is this an absurd position, but it also misses the critical point.  The Estate did *not* sue the other rowers, it sued Harnett.  Thus, whether Mr. Runsdorf *knew* that the shell was unlit makes no difference here– all that matters is that the shell was unlit.

The Estate also seeks to deflect responsibility for the rowers' failure (individually and collectively) to equip the rowing shell with a navigation light, arguing that the rowers were not aware that navigation lights were needed because they didn't use navigation lights in college. This is utterly outrageous and belied by the facts.  The rowers all testified that Vincent Houston looked for lights that morning, and on other mornings when lights were necessary.  The rowers testified that if lights were found, they would be used, but if **"there had not been lights available, we would have been, like, whatever."** Ignorance of the Navigation Rules is no excuse – even if concocted in an attempt to defeat summary judgment.

The undisputed fact is that the shell was unlit and, therefore not visible to Mr. Harnett. Whether the shell needed only a flashlight or fixed navigation lights is also irrelevant, because it had neither, and this was a cause of the accident.

Page 7 of 10

## POINT II

## NEGLIGENCE ON PART OF ROWERS

The Estate concedes that the *Pennsylvania Rule*'s burden shifting applies to both Harnett and the rowing shell. The Estate concedes that the rowers violated the Navigation Rules by failing to equip the rowing shell with a light. The Estate also concedes that the rowers face opposite to their direction of travel, and thus, when the rowers turned to head northbound, that they were facing south in the rowing shell. The Estate argues, however, that the admitted fact that the rowers were facing south, and that no one was facing north (in the direction of travel), does not mean that no one was maintaining a lookout. Once again, the Estate has introduced nothing, not even testimony from the rowers to suggest that the rowers actually maintained a lookout. Indeed, the Estate's expert concedes that by virtue of *"the nature of their activity they cannot maintain as diligent a lookout as a power vessel."* See, Report of Captain Ahlstrom (Exhibit 8) (emphasis added). Speculation notwithstanding, the undisputed facts demonstrate that the rowers did not maintain a lookout.

In opposition, the Estate provides no facts to overcome the presumption that the rowers' violations of the Navigation Rules not only *did not* cause the collision, but *could not* have caused the collision. And, the Estate does not even attempt to suggest how the failure to maintain a lookout *could not have* caused the collision. The Estate's arguments merely support that the rowers neither maintained any situational awareness nor a lookout.

## POINT III

## NO NEGLIGENCE ON PART OF HARNETT

Not every claimed fact will defeat a motion for summary judgment, only genuine issues of material fact. The Estate has failed to introduce any genuine issues of material fact to establish a violation of the Navigation Rules by Harnett.

Instead, in POINT IV, the Estate relies upon misrepresentations. For example, the Estate claims, *without any citation to the record*, that Mr. Harnett saw lights on in the Peter J. Sharp Boathouse and knew that he should take precaution because there would be rowing shells in the water. *See,* Memorandum in Opposition at p. 14. As already discussed in Harnett's moving papers, Mr. Harnett saw a light on in a structure but he was not aware that the structure he passed on the River was a boathouse. *See,* Deposition of Harnett at pp. 125-126) (Exhibit 4). Thus, the fact that he saw a light on did not indicate to him that rowers would be on the water. The Estate has not introduced evidence to contradict this testimony. It is therefore undisputed.

Similarly Mr. Harnett and Mr. Brady (Harnett's guest aboard the boat) both confirmed that the boat's windshield was clean and free of obstruction. Nonetheless, the Estate theorizes that Harnett could not have seen through the windshield because a rower thought it looked dirty to him after the accident. The Estate has not introduced any credible facts to create a genuine issue that the windshield was so dirty that Mr. Harnett could not and did not maintain a proper lookout.

Finally, the Estate in Point IV flip-flops on the speed that it believes Mr. Harnett should have be going. Earlier in its opposition papers, the Estate suggested that Mr. Harnett should have been going no more than 4 to 6 mph taking the current into effect (i.e., up to perhaps 9 or 10

mph). Then, at pages 14-15, the Estate suggested that Harnett should have been going at 4 to 6 mph, *without* taking the current into effect. Irrespective of the speed that the Estate suggests, it has not introduced any credible facts to create a genuine issue that Mr. Harnett could not have stopped or maneuvered in time to avoid collision with a properly lit rowing shell at the speed he was traveling. It is thus undisputed that Mr. Harnett was traveling at a safe speed.

## CONCLUSION

For the reasons set forth herein, Petitioner Andrew Harnett respectfully requests an Order dismissing all claims against Petitioner, with prejudice and costs.

Dated: December 7, 2011

Attorneys for Petitioner
RUBIN, FIORELLA & FRIEDMAN LLP

By: _____
James E. Mercante, Esq., (JM 4231)
Michael E. Stern, Esq. (MS 9113)
292 Madison Avenue, 11th Floor
New York, New York 10017
Ph: 212 953-2381
Our File No. 357-6871