James E. Mercante (JM 4231)
RUBIN, FIORELLA & FRIEDMAN LLP
292 Madison Avenue
New York, NY 10017
(212) 953-2381
Attorneys for Petitioner
ANDREW HARNETT
As owner of Vessel READY JET GO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    06-cv-699 (LMM)
IN THE MATTER OF THE COMPLAINT

                of                             **SUPPLEMENTAL**
                                                          **DECLARATION OF**
ANDREW HARNETT as owner of Vessel M/V          **MICHAEL E. STERN**
READY JET GO for Exoneration from or
Limitation of Liability,

               Petitioner.

---

       **I, MICHAEL E. STERN**, declare under penalty of perjury under the laws of the United States of America that:

1.   I am a member of the firm of RUBIN, FIORELLA & FRIEDMAN LLP, attorneys for petitioner Andrew Harnett, and I am familiar with the facts of this matter based upon personal knowledge and/or review of the file.

2.   The following exhibits are submitted in support of petitioner Andrew Harnett's motion for summary judgment.

### LIST OF EXHIBITS

    **Exhibit 13**        Deposition excerpt from Harnett Deposition

    **Exhibit 14**        Report of Charles Wetli

1

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 7, 2011

_____
MICHAEL E. STERN

# EXHIBIT 13

Page 189

A. Harnett

A. Because it would be immediately apparent if it wasn't. You would see it if it wasn't.

Q. It would reflect back in?

A. If it was on, it would reflect back in, yes, for certain.

Q. And you were required until sunrise -- let me just finish.

A. Physically, it would be in front of you. You would be able to see the light. Whether it's on or not is not relevant or not important. You would see that it's not in the up position.

Q. Mr. Harnett, it's going to help us both if I allow you to finish your answers and you allow me to finish my questions.

A. Right.

Q. We're not trying to have an adversarial relationship about speaking. You have all the time it takes to give a full answer that makes you satisfied. I'll try to make my questions finished. When I'm finish, I'll pause a moment. I'd appreciate it if you'd do the same. It will be a lot easier for the court

Page 190

A. Harnett

reporter.

A. I will try.

MR. BRENNAN: Can you read back the last question and answer?

(Whereupon the reporter read back the record as requested.)

BY MR. BRENNAN:

Q. I'm trying to lubricate the question process.

Were you required to show a white light until sunrise on the morning of the casualty?

A. Yes.

Q. And did you?

A. Yes.

Q. Did you show red and green lights at the bow of your vessel?

A. Yes.

Q. You have memory today of that fact?

A. My only clear memory of the red and green light and the white light was when we were tried up at the dock that I know now it was the Peter J. Sharp Boathouse, and they were on.

Q. What time was that, about?

Page 191

A. Harnett

A. What would be acceptable for me to say in the range of time would be anywhere from 6:10 to 6:25.

Q. Do you think you were back at the boathouse as early as 6:10?

A. No, it wouldn't be 6:10, but I can't give you a specific time.

Q. Do you think you were back at the boathouse by 6:25?

A. Yes.

Q. Your memory of the lights being on, is that the first instant, not literally, but in the first moments being back at the boathouse?

A. No. It would have been when I was on the dock.

Q. When was that?

A. Immediately tying up at the boathouse.

Q. So that's a couple of minutes after you arrived at the boathouse?

A. I couldn't say.

Q. What could you say, please?

A. We tied the boat up, turned the motor off. I got off the boat. That would have all been within the space of a half a minute.

Page 192

A. Harnett

Q. So it was one of the first things that happened when you arrived back at the boathouse?

A. We tied up the boat and I got off the boat. The lights were on.

Q. And do you have a custom and practice as to how you turn the lights on when you're getting under way when it's dark and lights are required?

A. The Hinckley, the toggle switch is on the -- the switches for the running lights on the Hinckley basically have -- I believe have a led indicator that the light is on if they're on. The light is off if they're off.

Q. What was your practice?

A. To turn them on.

Q. Would they turn off automatically when the sun came up or there was enough physical light?

A. Yes.

Q. You would have to manually turn them on and turn them off?

A. It's a physical switch, yes.

Q. Did you have to take the pole for the all around white and bring it to the vertical?

# EXHIBIT 14

**Charles V. Wetli, MD**
FORENSIC PATHOLOGIST

2 Berkery Pl.
Alpine, NJ
07620-0398

201-750-8220 (FAX 750-8221)
*Thanatopsis888@yahoo.com*

7 June 2011

Mr. Lawrence B. Brennan, Esq.
c/o Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
150 East 42nd Street
New York, NY 10017

Re: Runsdorf v. Harnett, et al

Dear Mr. Brennan:

Regarding the death of Mr. Jim Runsdorf, the following items were reviewed:

  Plaintiff Request for Summary Judgment
  NYPD Investigative Reports
  Handwritten Statement of Mr. Vincent Houston (12-21-06)
  The Hinckley Company Specifications for the T29R-Runabout Boat
  Autopsy and Toxicology Reports with Medical Examiner File Notes
  Medical Records of Drs. Globus, Kenet and Drs. Farkas, Kassalow & Resnick
  Photographs of the Rowing Shell and the Power Boat
  Depositions with Exhibits of Houston, Joyce, and Lundwall
  Reports of Harriet Metcalf and Capt. Joseph Ahlstrom

Very briefly, Mr. Runsdorf and three colleagues met at a boat house on the Harlem River and obtained a 45 foot rowing shell at about 0545h on October 24, 2005. The rowed the boat south on the Harlem River to a starting point for a 2000 meter rowing exercise. At that point they turned the boat around and began to adjust clothing and gear and drink some water prior to the exercise. Mr. Runsdorf was seated at the bow, facing the stern of the rowing shell. At about 0620h the rowing shell occupants heard a noise and looked

behind to see a 29 foot power boat about ten yards away heading toward them. The power boat collided with the starboard bow of the rowing shell, causing the vessel to capsize. The power boat retrieved three of the rowing shell crew, two of whom had injuries requiring medical attention. Mr. Runsdorf did not surface, and his body was recovered from the center of the Harlem River on October 27, 2005, about 75 hours after the collision. The post mortem examination revealed rigor mortis was fading (consistent with the environment and post mortem interval) and lividity was posterior and fixed. He had massive blunt craniocerebral trauma with depressed frontal and linear basilar skull fractures and traumatic brain injury, a lacerated spleen and pulmonary congestion and edema. There was no mention of the sphenoid sinus (for the presence of aspirated water). Toxicological analysis failed to detect the presence of any drugs or alcohol. At issue is the cause of death and the extent of any pain and suffering.

It should be noted that individuals who die in water, whether by drowning or from trauma, often float to the bottom where they remain until decomposition (with formation of gasses from yeast and bacterial action) causes them to float to the surface. Then wind and surface currents will cause them to move from the site of water entry. In the case of Mr. Runsdorf, his body was retrieved from the bottom of the river and this would be at the point where he entered the water (i.e. in the center of the river). The lividity being posterior and fixed also indicates the body did not move from that site. Thus, the location of his body and the presence of posterior and fixed lividity supports the contention that the collision of the two vessels occurred in the center of the river and not closer to either shore.

Mr. Runsdorf died from the head impact which occurred when he was struck by the hull of the power boat. The impact would have resulted in an immediate loss of consciousness and quite likely, immediate death. The pulmonary edema and congestion noted at the time of the autopsy could be the result of the head injury itself (neurogenic pulmonary edema) or from inhalation of water as vegetative functions continue for some time even after death occurs. In either event it does not indicate there was any consciousness following the head impact. The lacerated spleen, by itself a serious injury, did not contribute to his death although the 250ml hemoperitoneum (from the splenic injury) again indicates continued vegetative functions for a short time after death occurred.

The autopsy and medical records also confirm that Mr. Runsdorf was a very healthy and athletic man. Indeed, he had a healthy enlargement of his heart ("athelete's heart") because of his physical fitness. He would be expected to have at least a normal life expectancy.

It is therefore my opinion to a degree of reasonable medical certainty that Mr. Jim Runsforf died upon sustaining the head impact during the boat collision and therefore did not experience any pain or suffering from the moment, and that he would have at least a

3

normal life expectancy. Furthermore, the location of his body when found and the distribution of the lividity supports the contention that the vessel collision occurred in the center of the Harlem River and not near either shore.

Yours Truly,

Charles V. Wetli, MD

CURRICULUM VITAE
CHARLES V. WETLI, M.D.

# CURRICULUM VITAE
(3 January 2011)

## CHARLES V. WETLI, M.D.

TEL 201-750-8220
FAX 201-750-8221

thanatopsis888@yahoo.com

2 Berkery Place
Alpine, NJ  07620-0398